**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

Ms. Shaquana Johnson, individually and as PARENT, NATURAL GUARDIAN AND NEXT FRIEND OF E.H.,

Plaintiff,

Case No.: 1:26-cv-12286

vs.

ABBOTT LABORATORIES, ABBOTT LABORATORIES, INC., MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY

Defendants,

_____________________________/

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff, Ms. Shaquana Johnson (hereinafter "Plaintiff"), by and through undersigned counsel, Levin, Papantonio, Rafferty, Buchanan, O'Brien, Barr, Mougey, P.A., by way of complaint against ABBOTT LABORATORIES, ABBOTT LABORATORIES, Inc., MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY (hereinafter "Defendants"), alleges as follows upon information and belief:

**INTRODUCTION**

1. This action arises out of the injuries suffered by Plaintiff's premature infant, who was fed Defendants' cow's-milk-based infant formula and/or fortifier. Necrotizing Enterocolitis (hereinafter "NEC") is a deadly intestinal disease characterized by inflammation and injury of the gut wall barrier that may advance to necrosis and perforation of the gut. Advanced cases of NEC may lead to surgery and to death. Significantly higher rates of NEC have been found in premature or preterm babies with low birth weights who are fed cow's milk-based formula or fortifier

products. The companies who manufacture these products often intentionally mislabel and misrepresent the contents of the products both to the public at-large and to the health care community, passing off these deadly products as something similar to or even superior to human breast milk. Tragically, Baby E.H. (hereinafter "Baby E.H."), who was premature at birth, was fed these cow's milk-based products, developed NEC, and suffered significant injuries as a result.

2. Plaintiff, Ms. Shaquana Johnson, individually and as Parent, Natural Guardian, and Next Friend of Baby E.H., brings this cause of action against Defendants for claims arising from the direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, failure to warn, and/or sale of the Defendants' cow's milk-based products (hereinafter "Cow's milk-based Formula," "Cow's milk-based Fortifier," or collectively "Cow's Milk-Based Products").

## JURISDICTION AND VENUE

3. This is an action for damages which exceeds the sum of 75,000.00, exclusive of costs, interest, and attorneys' fees.

4. This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332, as complete diversity exists between Plaintiff and the Defendants, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

5. This Court has personal jurisdiction over Defendants Abbott Laboratories and Abbott Laboratories, Inc. because Defendants resides in this District, and are incorporated under the laws of Illinois and is authorized to conduct business and does conduct business in the State of Illinois. Defendant has marketed, promoted, distributed, and/or sold its Cow's Milk-Based Products in the States of Illinois and North Carolina, and Defendant has sufficient minimum

contacts with this state and/or sufficiently avails itself of the markets in the state through its promotion, sales, distribution, and marketing within this state to render exercise of jurisdiction by this Court permissible.

6. Venue of this action is proper in this Court pursuant to 28 U.S.C. §§1391 (a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. Venue is also proper under 18 U.S.C. §1965 (a) because Defendants Abbott Laboratories and Abbott Laboratories, Inc. are headquartered in this District and transacts substantial business in this District.

7. Per a stipulated agreement, the Parties have agreed that personal jurisdiction over the Mead Johnson Defendants is lacking in Illinois except to the extent that Plaintiffs' alleged use of Mead Johnson products and resulting injuries occurred in Illinois. However, per a stipulated agreement, the Parties agree that personal jurisdiction is proper in this Court for purposes of completing all pretrial proceedings.

8. Venue is proper in this Court, under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. The Parties, per a stipulated agreement, have further agreed that venue is proper in this Court for purposes of completing all pretrial proceedings in this Court.

## PLAINTIFF

9. Baby E.H. was born prematurely on September 24, 2010. Baby E.H. was treated in the Newborn Intensive Care Unit ("NICU") at WakeMed hospital in Wake County, North Carolina ("WakeMed"), where Baby E.H. developed NEC after being fed Defendants' Cow's Milk-Based Products, including Similac Special Care and Pregestimil. At all times material hereto, Baby E.H. was domiciled in and a citizen of the State of North Carolina, residing in Wake Forest,

North Carolina.

10. Plaintiff, Ms. Shaquana Johnson, the mother of Baby E.H., (hereinafter "Baby E. H.'s Mother"), is domiciled in and a citizen of State of North Carolina, and resides in Wake Forest, Wake County, North Carolina. Baby E.H.'s Mother brings this action to recover for Baby E.H.'s injuries, which are the direct and proximate result of consumption of Defendant's unreasonably dangerous cow's milk-based preterm infant nutrition products.

## DEFENDANTS

11. Defendant, Abbott Laboratories ("Abbott") was at all times material hereto and is now a corporation duly organized, incorporated, and existing under the laws of the State of Illinois with its principal place of business and headquarters in the State of Illinois and is thus a resident, citizen and domiciliary of Illinois. Abbott manufactures, designs, formulates, prepares, tests, provides instructions for, markets, labels, packages, sells, and/or places into the stream of commerce in all fifty states, including Illinois and North Carolina, premature infant formula and premature infant milk fortifier under the Similac brand name.

12. Defendant Abbott advertises that it provides the "#1 Formula Brand, Backed by Science" and claims to have "over 90 years of innovations" in infant formula.

13. Defendant Mead Johnson & Company, LLC is a Delaware limited liability corporation with its principal place of business located at 2400 W. Lloyd Expwy., Evansville, Indiana 47721.

14. Defendant Mead Johnson Nutrition Company is a Delaware corporation with its principal place of business located at 2400 W. Lloyd Expwy., Evansville, Indiana 47721.

15. Defendants Mead Johnson & Company, LLC, and Mead Johnson Nutrition Company ("collectively Mead") are companies based in Indiana that manufacture, design,

formulate, prepare, test, provide instructions for, market, label, package, sell, and/or place into the stream of commerce in all fifty states, including North Carolina, premature infant formula including Enfamil and Enfamil Human Milk Fortifiers, including Enfamil A+, Enfamil NeuroPro, Enfamil Enspire, EnfaCare Powder, and Pregestimil.

16. Defendant Mead Johnson Nutrition Company self-proclaims to be recognized as "a world leader in pediatric nutrition" and traces its history back to the company's founding in 1905 by Edward Mead Johnson, Sr. It claims to be the "only global company focused primarily on infant and child nutrition" and that its "singular devotion has made our flagship 'Enfa' line the leading infant nutrition brand in the world." Boasting "more than 70 products in over 50 countries," it claims that its "products are trusted by millions of parents and healthcare professionals around the world." It is this trust that Defendants Mead have intentionally exploited for their own pecuniary gain at the expense of vulnerable families throughout the United States and the world.

## FACTUAL ALLEGATIONS

### The Science and Scope of the Problem

17. According to the World Health Organization ("WHO"), babies born prematurely, or "preterm," are defined as being born alive before 37 weeks of pregnancy are completed, like Baby E.H. The WHO estimates that approximately 15 million babies are born preterm every year and that this number is rising.

18. Nutrition for preterm babies, especially those who have a very low birth weight (under 1500 grams) or extremely low birth weight (under 1000 grams), is significantly important. Since the United States ranks in the top ten countries in the world with the greatest number of preterm births, the market of infant formula and fortifiers is particularly vibrant.

19. Science and research have advanced in recent years confirming strong links

between cow's milk-based products and NEC causing and/or substantially contributing to death in preterm and severely preterm, low-weight infants, along with many other health complications and long-term risks to these babies. Additionally, advances in science have created alternative fortifiers that are derived from human milk and non-cow's milk-based products, however, the manufacturers of the Cow's Milk-Based Products continue to promote and sell the Cow's Milk-Based Product versions.

20. As far back as 1990, a prospective, multicenter study on 926 preterm infants found that NEC was **six to ten times more** common in exclusively formula-fed babies than in those fed breast milk alone and **three times more common** than in those who received formula plus breast milk. The study also found that NEC was rare in babies born at more than 30 weeks gestation whose diet included breast milk, but was **20 times more common** in those fed cow's milk-based formula only. A. Lucas, T. Cole, *Breast Milk and Neonatal Necrotizing Enterocolitis*, LANCET, 336: 1519-1523 (1990) (emphasis added).

21. A study published in 2009 evaluated the health benefits of an exclusively human milk-based diet as compared to a diet with both human milk and cow's milk-based products in extremely premature infants. The results show that preterm babies fed an exclusively human milk-based diet were **90% less likely** to develop surgical NEC as compared to a diet that included some cow's milk-based products. S. Sullivan, *et al*, *An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products*, JOURNAL OF PEDIATRICS, 156: 562-7 (2010) (emphasis added).

22. In 2011, the U.S. Surgeon General published a report titled, "The Surgeon General's Call to Action to Support Breastfeeding." In it, the Surgeon General warned that "for vulnerable premature infants, **formula feeding is associated with higher rates** of necrotizing enterocolitis

(NEC)." U.S. Dep't of Health & Human Serv., Off. of Surgeon Gen., "The Surgeon General's Call to Action to Support Breastfeeding," p.1, (2011) (emphasis added). This same report stated that premature infants who are not breast-fed are **138% more likely** to develop NEC. *Id*.

23. In 2012, the American Academy of Pediatrics issued a policy statement that all premature infants should be fed an exclusive human milk diet because of the risk of NEC associated with the consumption of Cow's Milk-Based Products. The Academy stated that "[t]he potent benefits of human milk are such that all preterm infants should receive human milk... If the mother's own milk is unavailable ...pasteurized donor milk should be used." *Breastfeeding and the Use of Human Milk*, PEDIATRICS, 129:e827-e841 (2012).

24. Further, a study published in 2013 showed that all 104 premature infants participating in the study receiving an exclusive human-milk based diet exceeded targeted growth standards and length and weight and head circumference gain. The authors concluded that "this study provides data showing that **infants can achieve and mostly exceed targeted growth standards when receiving an exclusive human milk-based diet**." A. Hair, *et al*, *Human Milk Feeding Supports Adequate Growth in Infants ≤1250 Grams Birthweight*, BMC RESEARCH NOTES, 6:459 (2013) (emphasis added). Thus, inadequate growth was proven to be a poor excuse for feeding Cow's Milk-Based Formula, but the practice has largely continued due to extensive and aggressive marketing campaigns conducted by infant formula such as the Defendants.

25. Another study published in 2013 reported the first randomized trial in extremely premature infants of exclusive human milk versus preterm cow's milk-based formula. The study found a **significantly higher rate** of surgical NEC in infants receiving the cow's milk-based preterm formula and supported the use of exclusive human milk diet to nourish extremely preterm infants in the NICU. E.A. Cristofalo, *et al*, *Randomized Trial in Extremely Preterm Infants*, J

PEDIATR., 163(6):1592-1595 (2013) (emphasis added).

26. In another study published in 2014, it was reported that NEC is "a devastating disease of premature infants and is associated with **significant morbidity and mortality**. While the pathogenesis of NEC remains incompletely understood, it is well established that the risk is increased by the administration of infant formula and decreased by the administration of breast milk." Misty Good, *et al*., *Evidence Based Feeding Strategies Before and After the Development of Necrotizing Enterocolitis*, EXPERT REV. CLIN. IMMUNOL., 10(7): 875-884 (2014 July) (emphasis added). The same study found that NEC "is the **most frequent and lethal gastrointestinal disorder** affecting preterm infants and is characterized by intestinal barrier disruption leading to intestinal necrosis, multi-system organ failure and death. *Id.* The study noted that "NEC affects 7-12% of preterm infants weighing less than 1500 grams, and the frequency of disease appears to be either stable or rising in several studies. *Id.* The typical patient who develops NEC is a premature infant who displays a rapid progression from mild feeding intolerance to systemic sepsis, and **up to 30% of infants will die from this disease**." *Id.* Advances in formula development have made it possible to prevent necrotizing enterocolitis, and the "exclusive use of human breast milk is recommended for all preterm infants and is associated with a significant decrease in the incidence of NEC." *Id.*

27. In yet another study published in 2014 it was reported that an exclusive human milk diet, devoid of Cow's Milk-Based Products, was associated with "lower mortality and morbidity" in extremely preterm infants without compromising growth and should be considered as an approach to nutritional care of these infants. Steven Abrams, *et al*., *Greater Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein Products*, BREASTFEEDING MEDICINE, 9(6):281-286 (2014).

28. In 2016, a large study supported previous findings that an exclusive human milk diet in extreme preterm infants dramatically decreased the incidence of both medical and surgical NEC. This was the first study to compare rates of NEC after a feeding protocol implementation at multiple institutions and years of follow-up using an exclusive human milk diet. The authors concluded that the use of an **exclusive human milk diet is associated with "significant benefits"** for extremely preterm infants and while evaluating the benefits of using an exclusive human milk-based protocol, "it appears that there were **no feeding-related adverse outcomes**." Hair, *et al*, *Beyond Necrotizing Enterocolitis Prevention: Improving Outcomes with an Exclusive Human Milk Based Diet,* BREASTFEEDING MEDICINE, 11-2 (2016) (emphasis added).

29. A publication by the American Society for Nutrition, in 2017, noted that human milk has "been acknowledged as the best source of nutrition for preterm infants and those at risk for NEC." The study compared the results from two randomized clinical trials on preterm infants with severely low weight (between 500 and 1250 grams at birth) and compared the effect of cow's milk-based preterm infant formula to human milk as to the rate of NEC. Both trials found that an **exclusive human milk diet resulted in a much lower incidence of NEC**. While the study noted that cow's milk-based preterm formulas provided consistent calories and were less expensive than human milk-based products, the **cow's milk-based products significantly increase the risk of NEC and death**. The study also noted the **"exponential" health care costs** associated with NEC and noted data from the U.S. from 2011-2012 that showed that the cost of NEC is $180,000 to $198,000 per infant and nearly doubles to $313,000 per infant for surgically treated NEC. Further, NEC survivors accrue substantially higher outpatient costs. Jocelyn Shulhan, *et al*, *Current Knowledge of Necrotizing Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products*, ASN ADV. NUTR., 8(1):80-91 (2017) (emphasis added).

30. The WHO and United Nation's International Children's Emergency Fund (UNICEF) held a meeting more than two decades ago to address concerns over the marketing of breast-milk substitutes. The WHO Director concluded the meeting with the following statement, "**In my opinion, the campaign against bottle-feed advertising is unbelievably more important than the fight against smoking advertisement**." Jules Law, *The Politics of Breastfeeding: Assessing Risk, Dividing Labor*, JSTOR SIGNS, vol. 25, no. 2: 407-50 (2000) (emphasis added).

31. Recognizing the abuse and dangers of the marketing of infant formula, in 1981, the World Health Assembly ("WHA"), the decision-making body of the world's Member States, developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk and outlawed any advertising or promotion of breast milk substitutes to the general public. Pursuant to Article 5.1 of the Code, advertising of breast-milk substitutes is specifically prohibited: "**There should be no advertising or other form of promotion to the general public** [of breast milk substitutes]." (emphasis added). In Article 5.2, the Code states that "manufacturers and distributors should not provide, **directly or indirectly**, to pregnant women, mothers or members of their families, samples of products within the scope of this Code." In addition, the Code expressly prohibits, "point-of-sale advertising, giving of samples, or any other promotion device to induce sales directly to the consumer at the retail level, such as special displays, discount coupons, premiums, special sales…" *See* Int'l Code of Marketing of Breast-Milk Substitutes, May 21, 1981, WHA 34/1981/REC/2, Art.5.3.

32. The World Health Organization's 2018 Status Report on this issue noted that "despite ample evidence of the benefits of exclusive and continued breastfeeding for children, women, and society, far too few children are breastfed as recommended." The Status Report states that "**a major factor undermining efforts to improve breastfeeding rates is continued and**

**aggressive marketing of breast-milk substitutes**," noting that in 2014, the global sales of breast-milk substitutes amounted to **US $44.8 billion** and "is expected to rise to **US $70.6 billion** by 2019." *Marketing of Breast-milk Substitutes: Nat'l Implementation of the Int'l Code, Status Report 2018*. Geneva: World Health Org., 2018, p.21 (emphasis added).

33. Recognizing a shift in the medical community towards an exclusive human based diet for preterm infants, Defendants began heavily promoting "human milk fortifiers," a name which misleadingly suggests that the product is derived from human milk, instead of being derived from Cow's Milk.

34. The Defendants have designed competing, systematic, powerful, and misleading marketing campaigns to persuade physicians and parents to believe that: (1) Cow's Milk-based formula and fortifiers are safe; (2) Cow's Milk-Based Products are equal, or even superior, substitutes to breastmilk; and (3) physicians consider their Cow's Milk-Based Products a first choice. Similarly, the Defendants market its products for preterm infants as necessary for growth, and perfectly safe for preterm infants, despite knowing of the extreme risks posed by Cow's Milk-Based Products and failing to warn of the deadly disease of NEC.

35. Thus, despite the existence of alternative and safe human milk-based fortifiers, the Defendants continues to market and/or sell the Cow's Milk-Based Products under the guise of being a safe product for newborns and despite knowing the significant health risk posed by ingesting these products, especially to preterm, low weight infants like Baby E.H.

**The Inadequate Warnings**

36. Defendants promote the use of its preterm infant Cow's Milk-Based Products to parents, physicians, hospitals, and medical providers as safe products that are specifically needed by preterm infants for adequate growth.

37. Despite the knowledge of the significant health risks posed to preterm infants ingesting the Cow's Milk-Based Products, including the significant risk of NEC, Defendants did not warn parents or medical providers of the risk of NEC in preterm infants, nor did Defendants provide any instructions or guidance on how to properly use its Cow's Milk-Based Products so as to lower the risk or avoid NEC.

38. In fact, Defendants did not provide any warning in its labeling, websites, or marketing that warns that its Cow's Milk-Based Products exponentially increase the risk of NEC in preterm infants, or that human breast milk, donor breast milk, and human breast milk-based formulas and fortifiers are much safer for preterm babies than its Cow's Milk-Based Products.

## Baby E.H. and the Dangerous, Defective Products

39. Baby E.H. was born prematurely on September 24, 2010.

40. Baby E.H. was fed Defendants' Cow's Milk-Based Products, including Abbott's Similac Special Care and Mead's Pregestimil, while in the NICU at WakeMed.

41. Upon information and belief, at the time Baby E.H. was fed Similac Special Care and Pregestimil, donor human milk was available at WakeMed as a safer human milk alternative to Defendants' Cow's Milk-Based Products.

42. Upon information and belief, had Defendants adequately warned Baby E.H.'s treating physicians and other health care providers at WakeMed of the risk of NEC associated with feeding Cow's Milk-Based Products, including Similac Special Care and Pregestimil, to preterm infants, those physicians and health care providers would not have fed Baby E.H. Defendants' Cow's Milk-Based Products or, in the alternative, would have warned Baby E.H.'s Mother of those risks before Baby E.H. was fed Defendants' Cow's Milk-Based Products.

43. Had Baby E.H.'s Mother been warned of those risks, she would have refused to allow Baby E.H. to be fed Defendants' Cow's Milk-Based Products and would have requested that Baby E.H. be fed human milk, including the donor human milk available at WakeMed.

44. After being fed Similac Special Care and Enfamil Pregestimil, Baby E.H. was diagnosed with NEC.

45. At the time of Baby E.H.'s injury, Baby E.H.'s parents were unaware of the fact that the Defendants' Cow's Milk-Based Products Baby E.H. was fed caused or substantially contributed to his development of NEC and ultimately to Baby E.H.'s injury.

**COUNT I: INADEQUATE DESIGN OR FORMULATION**
**(N.C. Gen. Stat. § 99B-6) (All Defendants)**

46. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

47. This is a product liability action within the meaning of N.C. Gen. Stat. § 99B-1. Defendant Abbott is the manufacturer of Similac Special Care, and Defendants Mead are the manufacturers of Pregestimil, within the meaning of N.C. Gen. Stat. § 99B-1.

48. Defendants designed, formulated, manufactured, marketed, distributed, and sold their Cow's Milk-Based Products, including Similac Special Care and Pregestimil, specifically for use as nutrition and nutritional supplements for preterm infants, like Baby E.H.

49. Defendants, as manufacturers, have a duty to hold the knowledge and skill of an expert, are obliged to keep abreast of scientific discoveries, and are presumed to know the results of all such advances.

50. Defendants acted unreasonably in designing and formulating their Cow's Milk-Based Products because, at the time those products left Defendants' control, Defendants knew or should have known, including from the scientific literature described in The Science and Scope of

the Problem Section, that feeding cow's milk-based formula and fortifier to preterm infants significantly increases the risk of NEC.

51. At the time their Cow's Milk-Based Products left their control, Defendants unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of NEC without substantially impairing the usefulness, practicality, or desirability of the products, including human milk-based formulas and fortifiers and other formulations that do not rely on cow's milk.

52. In addition and in the alternative, at the time their Cow's Milk-Based Products left their control, the design or formulation of those products was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume products of that design or formulation to nourish a preterm infant, particularly in light of the availability of human milk, including donor human milk, as a safer means of nourishing preterm infants.

53. Defendants' design and formulation of their Cow's Milk-Based Products was unreasonable in light of, among other things, the following:

a. The nature and magnitude of the risk of harm, including NEC, intestinal surgery, lifelong injury, and death, associated with feeding the products to preterm infants, which is their intended and reasonably foreseeable use;

b. The lack of awareness of that risk among parents and health care providers, because Defendants did not warn of it and instead promoted the products as safe and necessary for preterm infant growth;

c. The high likelihood that the products' design or formulation would cause harm to preterm infants;

d. The state of the art at the time the products were manufactured, including the scientific evidence showing that human milk substantially reduces the risk of NEC in preterm infants;

e. The technical and economic feasibility of safer alternatives, including human milk-based products and donor human milk, which were available and in use at the time; and

f. The relative benefits of those alternatives, which allow preterm infants to meet growth targets without the increased risk of NEC posed by Defendants' products.

54. The increased risk of NEC posed by Defendants' Cow's Milk-Based Products is not an inherent characteristic of those products that would be recognized by an ordinary person with the ordinary knowledge common to the community.

55. As a direct and proximate result of Defendants' unreasonable design and formulation of their Cow's Milk-Based Products, Baby E.H. suffered serious bodily injury.

56. Defendants' conduct, as described herein, was willful or wanton and/or malicious within the meaning of N.C. Gen. Stat. § 1D-15, in that Defendants consciously and intentionally disregarded, and were indifferent to, the rights and safety of preterm infants, including Baby E.H., which Defendants knew or should have known was reasonably likely to result in injury, damage, or other harm. Upon information and belief, Defendants' officers, directors, or managers participated in or condoned this conduct. Plaintiff is therefore entitled to recover punitive damages pursuant to Chapter 1D of the North Carolina General Statutes in an amount sufficient to punish Defendants and to deter Defendants and others from similar conduct.

WHEREFORE, Plaintiff, by and through undersigned counsel, demands judgment against Defendants for all applicable damages, costs of this action, post-judgment interest, and trial by jury.

**COUNT II: NEGLIGENCE (All Defendants)**

57. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

58. Defendants, as the manufacturers and/or sellers of Cow's Milk-Based Products, owed a duty to the consuming public in general, and Plaintiff in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute products free of unreasonable risk of harm to users and patients, when said product is used in its intended manner.

59. Defendants, as manufacturers, has a duty to hold the knowledge and skill of an expert, and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.

60. Defendants, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed and/or sold the subject Cow's Milk-Based Products.

61. Defendants breached the duty owed to Plaintiff and acted negligently in its actions, including, but not limited to, the following:

a. Designed the products such that there are latent and not obvious dangers for consumers and patients while the products are being used in a foreseeable and intended manner;

b. The products contained hidden and dangerous design defects and were not reasonably safe as intended to be used, subjecting preterm infants to risks of serious

bodily injury in that the products' design and/or manufacture amounted to and/or resulted in a defect failure mode of the products;

c. Failing to collect data to determine if its products were safe for preterm infants;

d. Failing to collect data to determine when and how its products could be used safely;

e. Failing to utilize the significant peer reviewed research to develop instructions;

f. Failing to develop evidence-based guidelines or instructions to decrease the risk of its products causing NEC;

g. Failing to provide evidence-based guidelines or instructions to decrease the risk of its products causing NEC;

h. Failing to stop or deter its products from being fed to extremely preterm infants like Baby E.H.;

i. Failing to provide evidence-based instructions or guidance on when or how a preterm infant should be transitioned to the products;

j. Failing to continuously and vigorously study its cow's milk-based products in order to avoid NEC in premature infants;

k. Failing to utilize economical and technically available safer manufacturing and/or design alternatives for the preterm infant formula and fortifier;

l. Failing to adopt an adequate or sufficient quality control program;

m. Failing to inspect or test its products with sufficient care; and/or

n. Failing to properly and adequately warn of the risks of NEC with use of its products.

62. Defendants knew or should have known that their products were to be used as nutrition and nutritional supplements with preterm infants, like Baby E.H.

63. Defendants knew or should have known that the use of its Cow's Milk-Based

Products with preterm infants was unreasonably dangerous in that its Cow's Milk-Based Products significantly increased the risk of NEC.

64. Furthermore, scientific data and well researched studies have concluded that the Cow's Milk-Based Products of the Defendants carried unreasonable risks of NEC, which far outweighed the products' benefits for premature infants like Baby E.H.

65. As a direct and proximate result of the negligence of Defendants, Baby E.H. suffered serious bodily injury.

66. Defendants' conduct, as described herein, was willful or wanton and/or malicious within the meaning of N.C. Gen. Stat. § 1D-15, in that Defendants consciously and intentionally disregarded, and were indifferent to, the rights and safety of preterm infants, including Baby E.H., which Defendants knew or should have known was reasonably likely to result in injury, damage, or other harm. Upon information and belief, Defendants' officers, directors, or managers participated in or condoned this conduct. Plaintiff is therefore entitled to recover punitive damages pursuant to Chapter 1D of the North Carolina General Statutes in an amount sufficient to punish Defendants and to deter Defendants and others from similar conduct.

WHEREFORE, Plaintiff, by and through undersigned counsel, demands judgment against Defendants for all applicable damages, costs of this action, post-judgment interest, and trial by jury.

## COUNT III: INADEQUATE WARNING OR INSTRUCTION (N.C. Gen. Stat. § 99B-5) (All Defendants)

67. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

68. Defendants, as the manufacturers and sellers of Cow's Milk-Based Products, including Similac Special Care and Pregestimil, owed a duty to the consuming public in general,

and to Baby E.H. in particular, to provide adequate warnings and instructions about the dangers and risks associated with the use of Cow's Milk-Based Products with preterm infants, specifically including but not limited to the risk of NEC.

69. Defendants owed a duty to provide warnings and instructions on their Cow's Milk-Based Products marketed and sold for use with preterm infants that adequately communicated information on the dangers and safe use of the products to the health care providers and staff using those products in a NICU, taking into account the characteristics of, and the ordinary knowledge common to, such health care providers and staff, and to specifically warn of the risk of NEC associated with the use of Cow's Milk-Based Products with preterm infants.

70. Defendants' Cow's Milk-Based Products are infant formulas, not prescription drugs, and in any event Defendants did not provide adequate warnings or instructions to the physicians or other health care providers who ordered or administered those products to Baby E.H.

71. Rather than provide adequate warnings, Defendants developed relationships which included incentives and financial gain to health care providers and facilities for using their Cow's Milk-Based Products within the NICU, such that health care providers and facilities had an incentive to withhold instructions and warnings from parents.

72. Defendants, as manufacturers, have a duty to hold the knowledge and skill of an expert, are obliged to keep abreast of scientific discoveries, and are presumed to know the results of all such advances.

73. Defendants, through their own testing and studies, consultants and experts, and knowledge of the scientific literature, as more specifically set forth in The Science and Scope of the Problem Section, knew or should have known that the use of Cow's Milk-Based Products with preterm infants significantly increases the risk of NEC and can cause severe injury and death.

74. Defendants acted unreasonably in failing to provide adequate warnings or instructions regarding the risk of NEC, in that:

a. At the time their Cow's Milk-Based Products left Defendants' control, the products, without adequate warning or instruction, created an unreasonably dangerous condition that Defendants knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm to reasonably foreseeable claimants, including preterm infants such as Baby E.H.; and/or

b. After their Cow's Milk-Based Products left Defendants' control, Defendants became aware of, or in the exercise of ordinary care should have known, that the products posed a substantial risk of harm to reasonably foreseeable users and consumers, including preterm infants such as Baby E.H., and failed to take reasonable steps to give adequate warning or instruction or to take other reasonable action under the circumstances.

75. The risk of NEC associated with feeding Defendants' Cow's Milk-Based Products to preterm infants was not open and obvious to, or generally known and recognized by, parents or health care providers.

76. Defendants failed to provide adequate warnings and instructions regarding their Cow's Milk-Based Products, including but not limited to the following:

a. Providing no warnings regarding the risk of NEC;

b. Providing inadequate labeling that failed to warn of the risks of use of Cow's Milk-Based Products with preterm infants, including but not limited to NEC;

c. Failing to provide proper instructions, guidelines, studies, or data on when and how to feed their products to preterm infants in order to decrease the risk of NEC;

d. Failing to include a warning or instruction that parents needed to be provided an informed choice between the safety of human milk and the dangers of Defendants' Cow's Milk-Based Products;

e. Failing to warn consumers and health care providers that Defendants' Cow's Milk-Based Products significantly increase a preterm infant's risk of developing NEC;

f. Providing warnings and instructions that were inadequate, vague, and confusing and that provided a false sense of security, in that they addressed certain conditions but did not warn that the use of Cow's Milk-Based Products significantly increases the risk of NEC or explain how to avoid that harm;

g. Failing to include a large and prominent warning that their Cow's Milk-Based Products are known to significantly increase the risk of NEC compared to human milk in preterm infants;

h. Failing to provide the well-researched and well-established studies linking Cow's Milk-Based Products to NEC in preterm infants;

i. Failing to cite or use current medical data on the proper and safe use of their products;

j. Failing to send "Dear Doctor" letters warning of the risk of NEC and the current scientific research and data;

k. Failing to advise physicians and health care providers that Cow's Milk-Based Products are not necessary to achieve growth and nutritional targets for preterm infants; and/or

l. Failing to include sufficient instructions and warnings such that health care providers and staff were properly warned of the dangers of NEC with the use of Cow's Milk-Based Products in preterm infants.

77. Upon information and belief, had Defendants provided adequate warnings and instructions, Baby E.H.'s treating physicians and health care providers at WakeMed would not have fed Baby E.H. Defendants' Cow's Milk-Based Products or, in the alternative, would have warned Baby E.H.'s Mother of the risk of NEC, and Baby E.H.'s Mother would have refused to allow Baby E.H. to be fed those products and would have requested human milk, including the donor human milk available at WakeMed.

78. Defendants' failure to provide adequate warnings and instructions was a proximate cause of Baby E.H.'s injuries, and as a direct and proximate result of that failure, Baby E.H. suffered serious bodily injury.

79. Defendants' conduct, as described herein, was willful or wanton and/or malicious within the meaning of N.C. Gen. Stat. § 1D-15, in that Defendants consciously and intentionally disregarded, and were indifferent to, the rights and safety of preterm infants, including Baby E.H., which Defendants knew or should have known was reasonably likely to result in injury, damage, or other harm. Upon information and belief, Defendants' officers, directors, or managers participated in or condoned this conduct. Plaintiff is therefore entitled to recover punitive damages pursuant to Chapter 1D of the North Carolina General Statutes in an amount sufficient to punish Defendants and to deter Defendants and others from similar conduct.

WHEREFORE, Plaintiff, by and through undersigned counsel, demands judgment against Defendants for all applicable damages, costs of this action, post-judgment interest, and trial by jury.

## COUNT IV: PARENTAL CLAIM FOR MEDICAL EXPENSES AND LOSS OF SERVICES (All Defendants)

80. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

81. At all relevant times, Ms. Shaquana Johnson was the parent and natural guardian of Baby E.H., a minor, and was legally responsible for Baby E.H.'s support and medical care.

82. As a direct and proximate result of Defendants' wrongful acts and omissions alleged above, Ms. Shaquana Johnson, individually, has incurred and will continue to incur, until Baby E.H. reaches the age of majority, necessary medical expenses and costs for the care and treatment of Baby E.H.'s injuries.

83. As a further direct and proximate result of Defendants' wrongful acts and omissions, Ms. Shaquana Johnson has lost, and will continue to lose during Baby E.H.'s minority, the services and earnings of Baby E.H. to which she is entitled as Baby E.H.'s parent.

84. Ms. Shaquana Johnson brings this claim individually, and it is derivative of the claims and allegations above.

WHEREFORE, Plaintiff, Ms. Shaquana Johnson, individually, demands judgment against Defendants for all medical expenses and other damages permitted by law, costs of this action, post-judgment interest, trial by jury, and whatever further relief this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For compensatory damages in an amount to be proven at trial;

2. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Defendants' conduct;

3. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

4. For exemplary and punitive damages against Defendants in an amount to be proven at trial, and sufficient to punish or deter Defendants and others from repeating the injurious conduct alleged herein;

5. For interest as permitted by law;

6. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

7. For such other and further relief as the Court deems proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a trial by jury on all issues triable by jury.

Respectfully submitted,

/s/ *Sara Papantonio*
Sara Papantonio
Levin, Papantonio, Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.
316 S. Baylen Street, Sixth Floor
Pensacola, FL 32502
(850) 435-7040
spapantonio@levinlaw.com